**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Lola O'BRIEN, Defendant–Appellant.**

No. 96–2298.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 16, 1997.

Decided July 9, 1997.

Daniel P. Bach, Cheryl B. Schacht (argued), Office of the U.S. Attorney, Madison, WI, for plaintiff–appellee.

Jonathan C. Smith, Bridget E. Boyle, Martin E. Kohler (argued), Milwaukee, WI, for defendant–appellant.

Before ESCHBACH, COFFEY and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Lola O'Brien (O'Brien) was convicted by a jury of one count of bank fraud, in violation of 18 U.S.C. § 1344, and one count of wire fraud, in violation of 18 U.S.C. § 1343. She was sentenced to twenty-seven months' incarceration, and ordered to pay $129,937.80 in restitution. O'Brien appeals, challenging her conviction and sentence. We affirm.

## I. FACTUAL BACKGROUND

Prior to 1987, O'Brien was married to Robert O'Brien, who owned and operated O'Brien Oil, located in Superior, Wisconsin. When Robert O'Brien died in September 1987, Lola O'Brien inherited O'Brien Oil, and became the company's president and sole shareholder. Shortly thereafter in January 1988, O'Brien decided to explore the possibility of selling O'Brien Oil to Como Oil, located in Duluth, Minnesota. She met with Robert Hall, president of Como Oil, in January 1988, and suggested a selling price of $500,000 for O'Brien Oil, which Hall declined to pay. Negotiations ceased, and O'Brien assumed control of the business, and arranged for

O'Brien Oil to receive a $100,000 line of credit from the National Bank of Commerce (the "Bank"), which had been doing business with O'Brien Oil for over forty years. This line of credit allowed O'Brien Oil to access working capital throughout the year without a specific payback date. In order to obtain the line of credit, O'Brien signed an agreement which pledged all of O'Brien Oil's assets as security for the payment of the money the company accessed through the line of credit. In addition to the line of credit, O'Brien also obtained a $53,000 real estate loan from the Bank in November 1989, which was secured by a mortgage on O'Brien Oil's main business facility. Finally, in yet another separate transaction, the defendant arranged in April 1992 for O'Brien Oil to receive a $55,779.55 loan, the purpose of which was to consolidate three previous loans the company had received to purchase equipment which were coming due. To obtain the consolidation loan, O'Brien was required to sign an agreement pledging all of the assets of O'Brien Oil as security for the loan.

In early December 1992, O'Brien again advised Hall at Como Oil's offices in Duluth, Minnesota that she was looking to sell O'Brien Oil by December 18, because she wanted to transfer her residence from Superior, Wisconsin to Florida, where two of her three daughters lived. O'Brien told Hall that she wanted to sell the business by December 18. Shortly after O'Brien's call, Hall, along with Como Oil's treasurer, Mark Oesterich, visited O'Brien Oil to inspect the premises. During that meeting, O'Brien told Hall that her asking price for O'Brien Oil was now $90,000. After returning to Como Oil's offices in Duluth, Hall determined that $90,000 was a fair price for O'Brien Oil's assets. Hall contacted O'Brien to accept her offer, and they agreed to an expedited schedule to complete the transaction in time for O'Brien to leave on December 18th. Hall thereafter contacted his attorney to draw up the purchase agreement.

In the course of preparing the documents for the sale of O'Brien Oil, Hall's attorney discovered that liens had been filed against the assets which Como Oil was seeking to purchase from O'Brien Oil.[1] Hall telephoned O'Brien to ask her about the liens, and O'Brien told Hall that the liens had been paid off, but had not yet been removed by the creditors. Because he had experienced a similar situation in the past, wherein one of Como Oil's creditors had inadvertently failed to remove a lien after it had been paid, Hall believed O'Brien and the closing proceeded. At the closing, and in response to a question posed by Hall's attorney, O'Brien again claimed that, despite the existence of the liens, the assets of O'Brien Oil were not pledged as security for any debt. The Asset Purchase Agreement, which the parties reviewed during the closing and which O'Brien signed at that time, contained a specific provision by which O'Brien warranted that the assets of O'Brien Oil were free from any lien or encumbrance. In fact, all of the Bank's liens on the property of the O'Brien Oil company were still unsatisfied.[2] At the time of the sale, O'Brien Oil owed the Bank $99,-000 on the line of credit, and $49,871.76 on the consolidation loan.

At the closing, and per her request, O'Brien received a cashier's check for $90,-000, which she deposited into her daughter's account at a Minnesota bank.[3] Immediately after the sale, O'Brien moved to Florida. The $90,000 was subsequently wire transferred in increments to the account her other two daughters had in Florida. Shortly after the sale, the Bank learned that O'Brien had sold the encumbered assets of O'Brien Oil to Como Oil.[4] The Bank contacted Como Oil to assert its rights over O'Brien Oil's assets,

---

1. Specifically, the assets Como Oil sought to purchase were O'Brien Oil's customer list, delivery trucks, inventory and accounts receivable, all of which were encumbered by liens.

2. The real estate loan was secured by assets which were not sold to Como Oil as part of the sale of O'Brien Oil's assets.

3. As mentioned *supra* at p. 526, O'Brien's other two daughters lived in Florida.

4. Bruce Thompson, assistant vice president of the Bank, testified that O'Brien had informed him on December 15 that O'Brien Oil was in the process of being sold. When asked by Thompson to identify the purchaser and the price of the sale, O'Brien refused to do either.

and Como Oil eventually agreed to pay $72,-000 to the Bank in exchange for the Bank agreeing to release its liens against O'Brien Oil's assets. Thus, the Bank absorbed the $18,000 difference between the sale price for O'Brien Oil and the settlement agreement with Como Oil as a loss.

At the time of closing, O'Brien Oil had a small amount of oil in its tanks, which it received from North Shore Oil (North Shore), its main supplier. North Shore and O'Brien Oil had an arrangement whereby O'Brien Oil paid for deliveries from North Shore within ten days of delivery. Beginning in late 1992, O'Brien Oil began to substantially increase its purchases of oil from North Shore. By December 1992, according to the testimony of Pat LeBlanc, North Shore's president, O'Brien Oil was ordering more oil from North Shore than it ever had before. In the final days before the sale of O'Brien Oil and before O'Brien left for Florida, O'Brien Oil submitted a number of checks to North Shore as payment for oil North Shore had delivered, but the Bank refused to honor these checks because O'Brien Oil was without sufficient funds to cover them. LeBlanc called O'Brien Oil to inquire about the dishonored checks, whereupon he learned that the assets of the company had been sold. North Shore Oil was never paid for many of the loads of oil it delivered to O'Brien Oil in the days prior to the sale, and it lost $40,-928.83 as a result.

## II. ISSUES

A. Whether the district court abused its discretion in admitting "other acts" evidence concerning fires at O'Brien Oil;

B. Whether the district court abused its discretion in declining to permit the defendant to take the stand to offer surrebuttal testimony;

C. Whether the Government presented sufficient evidence to sustain O'Brien's conviction for wire fraud; and

D. Whether the district court's calculation of the "loss" caused by O'Brien's fraud was proper?

## III. DISCUSSION

### A. Whether the district court abused its discretion in admitting "other acts" evidence concerning fires which occurred at O'Brien Oil?

O'Brien initially argues that the district court erred in permitting the Government to introduce "other acts" evidence in the form of testimony from Bruce Thompson (Thompson), assistant vice president of the Bank. Thompson testified that O'Brien received insurance reimbursement damage checks for fires which occurred at O'Brien Oil in early 1992 and failed to use the proceeds from those checks to replace a truck which had been lost in the fires.[5] She also claims that the trial judge erred in permitting a rebuttal witness to testify that O'Brien solicited him to set those fires.

### 1. Evidence concerning O'Brien's failure to use insurance proceeds from a fire at O'Brien Oil to replace a truck lost in that fire

Prior to trial, the Government notified O'Brien's counsel by letter of its intention to introduce four types of "other acts" evidence pursuant to Federal Rule of Evidence 404(b).[6] Specifically, the Government sought to introduce "other acts" evidence relating to four areas: 1) O'Brien's failure to pay North Shore Oil for the shipments of oil North Shore delivered prior to the sale; 2) O'Brien's use of the business funds of

---

**5.** Thompson testified that, because the truck was pledged as security for the outstanding loans O'Brien Oil had with the Bank, the Bank was co-recipient of the insurance checks. Thompson stated that he signed the insurance check over to O'Brien so that she could replace the truck.

**6.** Rule 404(b) provides, in relevant part:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, ... of the general nature of any such evidence it intends to introduce at trial.

O'Brien Oil for her personal purposes; 3) O'Brien's refusal to permit cash payments received from customers prior to the sale of O'Brien Oil to be deposited into O'Brien Oil's business account, as well as her failure to permit insurance proceeds received from fires at O'Brien Oil to be deposited into the company's account; and 4) O'Brien's alleged solicitation of James Hanson (Hanson) to burn down certain buildings owned by O'Brien Oil in order to collect those insurance proceeds. O'Brien responded with the filing of a motion in limine seeking to exclude all of the "other acts" evidence the Government sought to introduce.

The district court heard argument on O'Brien's motion in limine, and *ruled that it would allow the Government to present evidence pertaining to O'Brien's failure to pay other creditors, her use of O'Brien Oil funds for personal purposes, and her refusal to permit cash receipts from customers and insurance proceeds from the fires to be deposited into O'Brien Oil's business accounts.* The district court did agree to exclude evidence relating to O'Brien's alleged solicitation of Hanson to burn down certain of O'Brien Oil's buildings, ruling that it would be "more prejudicial than probative." R.61 at 16. In so ruling, however, the district court noted that the evidence might become admissible as rebuttal testimony.

During the prosecution's case-in-chief, the Government, over objection by defense counsel, elicited testimony from Thompson concerning O'Brien's receipt and use of the insurance proceeds from the fires at O'Brien Oil as follows:

Q: Do you recall one or more fires that occurred at the O'Brien Oil Company?

[DEFENSE COUNSEL]: I'm going to object to that

. . . .

[THE COURT]: Sustained at this point.

Q: Do you ever recall the defendant receiving any insurance checks during 1992?

A: Yes.

Q: Was the bank listed as one of the payees on those checks?

A: Yes.

Q: Do you know what those insurance checks were for?

[DEFENSE COUNSEL]: I'm going to object to it, Your Honor, as immaterial and irrelevant.

[THE COURT]: Overruled.

A: They were for replacement of assets lost in a fire.

[DEFENSE COUNSEL]: I'm going to move that it be stricken, Your Honor.

[THE COURT]: Overruled.

Q: Assets that were lost in a fire where?

A: Well, . . . there was a fire at the building, the business premises and there was damage to the facility itself as well as some equipment inside and then there were insurance checks, because we're the lienholder of record, made out two-party and those checks then were cashed. . . . And then there was another check later on and . . . she told me that she was going to be replacing a truck with that. . . .

Q: So just to clarify, were you talking about assets of the O'Brien Oil Company that were damaged?

A: Right.

\* \* \*

Q: Did she replace the truck that had been destroyed?

A: Not to my knowledge. . . . I'm not aware of a truck that was replaced.

O'Brien claims that this testimony was contrary to the district court's ruling on the motion in limine, in that the jury was permitted to hear about the fires which occurred at O'Brien Oil. O'Brien further claims that this evidence was prejudicial to her and was not admissible under Rule 404(b). We disagree.

■ The district court's ruling on the admissibility of "other acts" evidence under Rule 404(b) is reviewed for an abuse of discretion. *United States v. Hernandez*, 84 F.3d 931, 933 (7th Cir.1996). "Other acts" evidence may be admitted to show " 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake.' " *Id.* at 935 (quoting Fed.R.Evid. 404(b)). Federal Rule of Evidence 404(b) provides that "other acts" evidence "is inadmissible to show that the defendant has a bad character and pro-

pensity to commit crime and that [the defendant] acted consistently with that propensity or character." *Id.* (citing *United States v. Neely*, 980 F.2d 1074, 1078 (7th Cir.1992)). Under the four-part test we employ to review the district court's ruling, the "other acts" evidence is admissible if: "1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; 2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; 3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; 4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *United States v. Yusufu*, 63 F.3d 505, 511 (7th Cir.), cert. denied, — U.S. —, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995); see also *United States v. Smith*, 103 F.3d 600, 603 (7th Cir.1996).[7]

■ Contrary to O'Brien's assertion, a reading of the district court's motion in limine ruling (see italicized text *supra* at p. 528) and the above-quoted testimony reveals that the testimony received in evidence was not contrary to the motion in limine ruling and actually pertained to a matter which the court specifically ruled was admissible; namely, the Government's proof of O'Brien's bank fraud in that she failed to use insurance proceeds to replace the truck encumbered with a lien lost in the fires at O'Brien Oil. The district court ruled that such evidence was admissible to show that, in the months leading up to the sale of O'Brien Oil, the defendant was diverting O'Brien Oil funds for her personal use. The district judge ruled that such evidence was proper to show O'Brien's plan, preparation and motive. The record shows that, when the Government initially asked the witness whether he was aware of any "fires" at O'Brien Oil, the judge prudently sustained the objection, as it was not clear at that point that the testimony would pertain to the fraudulent use of insur-

ance proceeds, as opposed to alleged solicitation of arson (which the judge had excluded from the Government's case-in-chief). Only when the Government clarified that the questioning was in reference to insurance proceeds which O'Brien Oil received from the loss of assets pledged as security for the loans it had received from the Bank did the judge permit the witness to testify. Thus, Thompson's testimony was admitted in a manner consistent with the court's pre-trial order.

■ Further, the testimony did not refer to O'Brien's propensity to commit the crime charged. At no point during that testimony did the Government seek to attribute the fires at O'Brien Oil to the defendant or to any suspicious activities. The testimony only addressed the business practices of the defendant in the months leading up to the fraudulent sale of O'Brien Oil. The Government's theory was that O'Brien drained the company's resources in the months leading up to the sale in December, with the result that O'Brien Oil was in dire financial straits at the time of the sale and which caused O'Brien to seek a quick sale as a way of defrauding her creditors. This theory was supported by evidence that O'Brien sought to close on the sale of the business to Como Oil within a week or two after initially contacting Hall, as well as testimony that the Bank was in the process of returning overdrawn checks drawn on O'Brien Oil's account, and planned to stop honoring such checks altogether. Further, there was testimony from employees of O'Brien Oil that the defendant was consistently using the company's funds for her personal use. The evidence established that O'Brien had run her business into financial ruin in the months leading up to the fraudulent sale, chiefly by diverting moneys intended for O'Brien Oil to her own use. O'Brien's failure to replace the truck pledged to the Bank by using insurance proceeds received when the vehicle was destroyed by fire was probative of O'Brien's plan to drain

---

7. O'Brien does not argue in her brief that the evidence was either too remote in time or too dissimilar from the fraud of which she was convicted (# 2 of the four-part test); nor does she argue that the testimony was insufficient to support a jury finding that she actually failed to use

the proceeds to replace the truck (# 3 of the test). Thus, we focus our analysis on whether the evidence tended to establish a matter other than her propensity to commit the crime charged, and whether the evidence was unfairly prejudicial.

the company's assets. Furthermore, proof of her motive for defrauding creditors was not unfairly prejudicial. *See United States v. Shriver*, 842 F.2d 968, 974 (7th Cir.1988) (evidence that small business owner failed to comply with terms of franchise agreement relevant to show that business was failing financially, thus providing motive for making false statement to bank); *see generally* Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 404.08[3] (Joseph M. McLaughlin ed., 2d ed.1997).

### 2. Evidence presented in rebuttal concerning O'Brien's alleged solicitation of arson

■ O'Brien took the stand in her own defense, and denied intending to defraud anyone in the sale of O'Brien Oil, and she further claimed that she was discussing the possible sale of O'Brien Oil to other buyers, but she was not in a hurry to sell the business. O'Brien also testified that the main business premises of O'Brien Oil were valued at approximately $180,000, and she expected them to bring $160,000 when sold.[8] After O'Brien had completed her direct testimony, the Government sought permission from the court (outside of the jury's presence) to question her on cross examination concerning her alleged solicitation of Hanson to burn down O'Brien Oil's buildings. The district judge noted that he had earlier stated when declining to permit the Government to introduce such evidence in its case-in-chief that the testimony might be admissible on rebuttal. He determined that the rebuttal testimony would impeach O'Brien's testimony that she expected to realize $160,000 from the sale of building, as it would tend to show that she actually thought she could get more for it in insurance than she could through sale. On cross-examination, O'Brien specifically denied having asked Hanson to burn down O'Brien Oil's buildings, and denied that she was in a hurry to sell her business and move away from Superior. The Government was then permitted to introduce Hanson's testimony that O'Brien had asked him on a number of occasions to burn down O'Brien Oil's

building. O'Brien argues that the district court erred in permitting the Government to introduce this evidence. We disagree.

■ Once a defendant takes the stand and denies his criminal activity, it is proper for the district judge to permit the Government to offer rebuttal evidence in contradiction of that testimony. As this court stated in *United States v. York*, 933 F.2d 1343 (7th Cir.1991), " 'Evidence of another crime which tends to undermine defendant's innocent explanation for his act will be admitted.' " 933 F.2d at 1350 (quoting *Weinstein's Evidence* § 404[12] at 404–84 (1990)). This court has frequently held in the past that the Government may offer "other acts" evidence in rebuttal that tends to contradict the defendant's assertion of innocence during the defense case-in-chief. *York*, 933 F.2d at 1350; *United States v. Mazzanti*, 888 F.2d 1165, 1171 (7th Cir.1989) ("other acts" testimony which the government agreed not to present in its case-in-chief properly admitted on rebuttal after defendant denied involvement in charged offense); *United States v. Chaimson*, 760 F.2d 798, 804–06 (7th Cir.1985) (where defendant gave "absolute and unequivocal" denial of involvement in fraud scheme when testifying, Government could introduce "other acts" evidence in rebuttal to contradict that denial). As noted, the district court when ruling on the pre-trial motion in limine specifically observed that evidence about the alleged solicitation of arson might become relevant on rebuttal depending on the evidence at trial. In light of O'Brien's testimony in which she directly and unequivocally denied that she was desperate to sell O'Brien Oil and believed she could get $160,000 for the company's building, the court determined that the testimony concerning her alleged solicitation of Hanson to burn down O'Brien Oil's building would be relevant to show her motive for committing the fraud, namely that (contrary to her testimony) she did not actually believe that the building was worth $160,000, as well as her plan and preparation to commit the fraud. After having heard O'Brien's testi-

---

8. These premises were subject to the $53,000 real estate loan discussed *supra* and were not part of the assets sold to Como Oil.

mony, the district court was in a better position to reassess the relative value of the testimony of her alleged solicitation of arson. *See* Weinstein, *supra* § 404.06[3] ("As a practical matter, it may be difficult to strike [the balance between probative value and prejudicial effect of other acts evidence] until the defense case is concluded; in many cases, only then can the government's need for the evidence be weighed against the ensuing prejudice to the defendant."). O'Brien took the stand and stated that she believed that O'Brien Oil's building would bring $160,000 at sale. She further offered testimony in opposition to the Government's witnesses (the district court characterized her testimony as "diametrically opposed to everything we've heard up till now"). For example, she claimed that she was not in a hurry to sell O'Brien Oil, that she was "[n]ever happier in [her] life" because she was "starting a new adventure and it was fun." Only after hearing O'Brien's own testimony did the judge permit the Government to question her concerning solicitation of arson. In light of her blanket denial that she had any intention of defrauding her creditors and believed the assets of O'Brien Oil had substantial value, we hold that the district court did not abuse its discretion in permitting the evidence concerning alleged solicitation of arson during the Government's rebuttal.

**B. Whether the district court abused its discretion in declining to permit the defendant to take the stand to offer surrebuttal testimony?**

█ Following Hanson's rebuttal testimony, O'Brien sought to take the stand again in surrebuttal to dispute Hanson's allegations that she solicited him to burn down O'Brien Oil's buildings. The district court refused to permit O'Brien to take the stand in surrebuttal, but did allow the defense to present a different surrebuttal witness, Father Robert Urban, to testify that Hanson had a poor reputation for truthfulness. O'Brien argues that the district court erred in declining to permit her to take the stand herself. We disagree.

█ A district judge has broad discretion in determining whether to permit surrebuttal testimony, and "[w]e will not disturb a trial court's decision regarding the admissibility of surrebuttal testimony unless there is an abuse of [that] discretion." *United States v. Mitan,* 966 F.2d 1165, 1176 (7th Cir.1992). The district court's ruling is afforded " 'great deference' " by this court. *Id.* (quoting *United States v. Gaertner,* 705 F.2d 210, 217 (7th Cir.1983)). Federal Rule of Evidence 611(a) authorizes district courts to " 'exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.' " *United States v. Chapman,* 954 F.2d 1352, 1374 (7th Cir.1992) (quoting Fed.R.Evid. 611(a)).

O'Brien sought to take the witness stand to rebut the testimony of Hanson that she had repeatedly solicited him to burn down buildings at O'Brien Oil. The district judge determined, however, that O'Brien's proffered surrebuttal testimony would merely be cumulative of testimony she had already presented. The court concluded that O'Brien had *already* testified during her direct and cross examination during the defense's case-in-chief that she had never solicited Hanson or anyone else to commit arson at O'Brien Oil, and thus her proffered surrebuttal testimony would be cumulative. After reviewing the record of O'Brien's testimony, we agree with this conclusion. As noted, the district judge did not deny O'Brien the opportunity to present surrebuttal testimony altogether; rather, he permitted Father Urban to testify about Hanson's poor reputation for truthfulness in the community. Since O'Brien had already testified about the matters she would have testified to on surrebuttal, and was permitted to present the *non-cumulative* surrebuttal testimony of Father Urban, "[w]e hold that the [district] court did not abuse its discretion in denying the admission of surrebuttal testimony from [O'Brien], repeating the same testimony given earlier at trial, as this testimony would only have been cumulative." *Gaertner,* 705 F.2d at 217.

## C. Whether the Government presented sufficient evidence to sustain O'Brien's conviction for wire fraud?

The wire fraud count of the indictment against O'Brien charged her with placing an interstate telephone call from O'Brien Oil's offices in Wisconsin to Como Oil's offices in Minnesota on or about December 10, 1992, in furtherance of her fraudulent scheme. O'Brien contends that the evidence adduced at trial was insufficient to sustain her conviction for wire fraud. Specifically, she claims that: 1) the Government failed to prove that O'Brien placed an interstate telephone call from O'Brien Oil's offices in Wisconsin to Como Oil's offices in Minnesota; and 2) the Government failed to prove that any such call was in furtherance of a scheme to defraud.

The standard by which we review a challenge to the sufficiency of the evidence is well-established:

When reviewing a conviction for sufficiency of the evidence, our role is limited. It is not our function to reweigh the evidence, nor to substitute our judgment for that of the factfinder. *United States v. Hatchett,* 31 F.3d 1411, 1416 (7th Cir.1994). We consider the evidence in the light most favorable to the prosecution, making all reasonable inferences in its favor, and will affirm the conviction so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Reversal is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Garcia,* 35 F.3d 1125, 1128 (7th Cir.1994) (quoting *United States v. Gutierrez,* 978 F.2d 1463, 1468–69 (7th Cir.1992)).

*United States v. Ross,* 77 F.3d 1525, 1542 (7th Cir.1996).

The wire fraud statute under which O'Brien was convicted provides, in relevant part, that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate ... commerce any ... sounds for the purpose of executing such scheme or artifice, shall be fined ... or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years or both.

18 U.S.C. § 1343. To establish that the defendant committed wire fraud under this statute, the Government is required to prove: "1) the defendant's participation in a scheme to defraud; 2) the defendant's intent to defraud; and 3) the defendant's use of the wires in furtherance of the fraudulent scheme." *Ross,* 77 F.3d at 1542 (citing cases).

As to O'Brien's first argument, the indictment alleged that, on or about December 10, O'Brien placed an interstate phone call from O'Brien Oil's office in Superior, Wisconsin, to Como Oil's office in Duluth, Minnesota. The evidence supporting the conclusion that she placed this call included the testimony of Hall, Como Oil's President, who testified that he received a call from O'Brien at his Duluth office in early December, and that he believed the call came from O'Brien Oil's office in Superior. Como Oil's treasurer, Oesterich, testified that he was in Hall's office in Duluth when Hall received the call from O'Brien. Special Agent Mark Egan, who interviewed O'Brien during the course of the investigation into the sale of O'Brien Oil, testified that O'Brien told him that she initially contacted Hall at Como Oil's office in Duluth from O'Brien Oil's office in Superior approximately one week before the closing (December 18). Finally, O'Brien herself admitted on cross-examination that she called Hall from her office in Superior at his office in Duluth in connection with the sale of O'Brien Oil. From this testimony, a trier of fact could easily conclude that O'Brien in fact placed an interstate telephone call to Como Oil's office in Duluth on or around December 10, 1992 as described in the indictment.

As to O'Brien's argument that the evidence failed to establish that the

scheme had already been conceived at the time the call was placed, we first observe that intent need not be proved directly; it may be "established by circumstantial evidence and by inferences drawn from the facts and circumstances surrounding the scheme." *United States v. LeDonne,* 21 F.3d 1418, 1429 (7th Cir.1994) (citing cases). As this court has noted in the past, " 'there is nothing novel about establishing a crime through the use of circumstantial evidence ... [c]ase law recites that circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable.' " *United States v. Hatchett,* 31 F.3d 1411, 1421 (7th Cir.1994) (quoting *United States v. Rose,* 12 F.3d 1414, 1417 (7th Cir. 1994)).

The circumstantial evidence amply supports the jury's conclusion that O'Brien had already formulated her fraudulent scheme by the time she called Hall in Duluth, and thus that the call was placed in furtherance of the scheme. First, it is clear that· O'Brien's desire to sell her business had been in place virtually from the time of her husband's death in 1987. Upon inheriting O'Brien Oil, the defendant contacted Hall in an attempt to negotiate a sale to Como Oil, but Hall thought that the defendant's asking price was too high. Further, in the months preceding the sale of O'Brien Oil to Como Oil, the defendant, who had a habit of using O'Brien Oil funds for personal purposes, began to intensify her use of the company's funds for her own uses. She instructed Susan Brannan (Brannan), the company's bookkeeper, to give the insurance checks O'Brien Oil received from the fires directly to her, as opposed to depositing them into O'Brien Oil's company accounts, and there was testimony that O'Brien failed to replace the truck which had been pledged as security for O'Brien Oil's debts when it was lost in the fires. In the year preceding the sale to Como Oil, the defendant opted not to pay down the line of credit O'Brien Oil had at the Bank, even though it was typical for oil businesses to pay down their lines of credit prior to the winter months, so they could access the lines in order to purchase oil as demand increased.

All of this occurred prior to O'Brien's initial phone call to Hall suggesting that she wanted to sell O'Brien Oil, but the content and context of her communications with Hall provide even more support for the jury's verdict. O'Brien told Hall that she wanted a quick sale, and proffered the $90,000 asking price (which was significantly less than she had asked that Como Oil pay for O'Brien Oil earlier) immediately after the initial phone call. O'Brien fraudulently represented to Hall at least once prior to the closing, which itself occurred just a week or two after the initial phone call, that O'Brien Oil's assets were not encumbered by liens. Further, O'Brien failed to inform any of her employees prior to the sale that the business had been or was about to be sold. She also refused to discuss the terms of the sale with her banker, Thompson, who testified that in early December 1992, the Bank had notified O'Brien Oil that it would no longer honor overdrafts on O'Brien Oil's business account. Hall testified that O'Brien initially requested that the $90,000 be wire transferred to an account in Florida, but Como Oil refused and gave her a cashier's check instead, which the defendant deposited into a daughter's account in Minnesota. The $90,000 was subsequently wire transferred in increments to a bank account maintained by O'Brien's other two daughters in Florida. Finally, the defendant moved to Florida immediately after the closing. In sum, the record amply supports the conclusions that O'Brien's scheme entailed draining as much of the assets of O'Brien Oil for her personal use in the months preceding the sale as possible, she was fully aware of the fact that the assets of O'Brien Oil were encumbered at the time of the sale, and her call to Hall was in furtherance of her fraudulent scheme to defraud her creditors. We hold that the Government presented sufficient evidence to sustain O'Brien's conviction for wire fraud.

*D. Whether the district court's calculation of the "loss" caused by O'Brien's fraud was proper?*

█ O'Brien argues finally that the district court erred in attributing the $40,928.83 North Shore Oil never received for the oil it had shipped to O'Brien Oil in the weeks

immediately prior to O'Brien Oil's sale as a "loss" caused by O'Brien for sentencing purposes. We review the district court's calculation of loss under the Guidelines for clear error. *United States v. Morris*, 80 F.3d 1151, 1171 (7th Cir.1996). The meaning of the term "loss" is a question of law reviewed de novo. Id.; *United States v. Mount*, 966 F.2d 262, 265 (7th Cir.1992).

 The district court calculated the total loss caused by O'Brien's fraud to be $129,937.80. This total was achieved by adding the $72,000 Como Oil had to pay to get the Bank's liens on O'Brien Oil's assets released (minus a check which Como Oil stopped payment on for $991.03, for a total of $71,008.97), with the $18,000 loss to the Bank based on the difference between the $90,000 value of O'Brien Oil and the $72,000 the Bank received from Como Oil, for a total of $89,008.97. The judge then determined that the $40,928.83 loss to North Shore was attributable to O'Brien as arising from relevant conduct. The judge added the $89,008.97 to the $40,928.83, and achieved a total loss calculation of $129,937.80. The court then computed O'Brien's sentence range using Guideline § 2F1.1, the Guideline applicable to fraud cases. Under § 2F1.1(b)(1), the defendant's offense level is increased incrementally based on the amount of loss caused by the fraud. Application Note 3 to § 2F1.1 provides guidance as to how the loss caused must be calculated, stating: "For the purpose of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.... The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." 1995 U.S.S.G. § 2F1.1, comment. (n.8). When calculating the amount of loss attributable to the defendant's fraudulent scheme, the sentencing court is to consider all relevant conduct under § 1B1.3(a) and is not limited to loss caused by the offense of conviction. *United States v. Sykes*, 7 F.3d 1331, 1335–36 (7th Cir.1993). "Relevant conduct," in turn, is defined as "all acts and omissions committed, ... or willfully caused by the defendant ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in

the course of attempting to avoid detection or responsibility for that offense." 1995 U.S.S.G. § 1B1.3(a)(1)(A). The district court concluded that the $40,928.83 lost by North Shore Oil was attributable to O'Brien as arising from the "relevant conduct" of her scheme.

O'Brien offers alternative arguments which she claims expose the district court's error. Initially, she argues that, because it was Lavine's responsibility to handle the O'Brien Oil Company's books, it was he who caused the loss to North Shore by issuing checks to North Shore with insufficient funds to cover them. Second, she asserts that, even assuming that she was responsible for North Shore's loss, the evidence showed that most of the oil had already been delivered to O'Brien Oil's customers, and since some of those customers had not yet paid (and were thus listed as accounts receivable on O'Brien Oil's books), it was unclear how much of North Shore's loss was attributable to O'Brien personally. Her arguments on both of these points are without merit.

### 1. Attribution of the loss to O'Brien, as opposed to Lavine

 O'Brien argues initially that Lavine, O'Brien Oil's manager, caused the loss to North Shore, since it was Lavine who placed the orders for oil prior to the company's sale, and who was responsible for writing the checks to pay for that oil. O'Brien focuses on testimony by Lavine wherein he admitted that, in the days preceding the sale of O'Brien Oil, he "tested the waters" by writing checks to North Shore for oil delivered even though O'Brien Oil did not have adequate funds in its accounts to cover those checks.

O'Brien's argument overlooks the substantial evidence in the record demonstrating that the defendant was fully aware of and involved in the running of the O'Brien Oil business, and that she directed the actions of Lavine, as well as Brannan (O'Brien Oil's bookkeeper), concerning financial decisions. Brannan testified that, at the defendant's direction, she began in 1990 to send via Federal Express amounts of cash ranging from a

few hundred to over a thousand dollars to the defendant's daughter in Florida on a bi-weekly or monthly basis, and that on occasion she sent cash directly to the defendant in Florida as well. Brannan further testified that O'Brien, upon learning that Brannan had deposited an insurance check for assets lost in the fire into O'Brien Oil's company bank account in the spring of 1992, directed Brannan to give subsequent checks directly to her. Finally, Brannan testified that, in the weeks preceding the sale of O'Brien Oil, the defendant was keeping all of the cash payments received from customers for herself and not depositing those amounts into O'Brien Oil's business account. Lavine testified that O'Brien had a habit of using business funds for her personal use, and that this practice was causing the company to go downhill financially. He testified that he never questioned her about this, since in his opinion the defendant was knowledgeable enough about the business to understand the effects of her diversion of funds, and he was further concerned that if he questioned her, he would lose his job. From the totality of the testimony of Lavine and Brannan presented at trial, the trial court could readily conclude that the loss to North Shore Oil was a direct result of the defendant's fraudulent scheme, which entailed draining the finances of O'Brien Oil for her personal use, particularly in the weeks preceding the sale to Como Oil.

### 2. Attribution of North Shore Oil's loss for oil which had already been delivered by O'Brien Oil to its customers

■ O'Brien next contends that, even if she (as opposed to Lavine) was responsible for North Shore Oil's loss, the Government failed to prove what portion of the $40,928.83 loss was directly attributable to her. O'Brien argues that, since O'Brien Oil had already delivered most of the oil it had received from North Shore on to its own customers, the moneys owed North Shore

showed up as "accounts receivable" on O'Brien Oil's books. She asserts that these amounts were in effect "converted" by Como Oil when it (presumably) collected on these accounts after the sale without turning over the proceeds to North Shore.

This argument also fails. First, the evidence established that at least some of the customers of O'Brien Oil had paid prior to the sale. O'Brien Oil had shipped virtually all of the $40,928.83 worth of oil received from North Shore to its customers by the time of the sale, but only had $27,729.88 in accounts receivable outstanding when O'Brien Oil was sold. As noted, Brannan testified that O'Brien was intercepting all of the cash payments the company received for herself in the weeks preceding the sale. Thus, the evidence supports the conclusion that O'Brien had taken at least *some* of the money owed to North Shore Oil for herself by the time O'Brien Oil was sold.

■ Further, it is not necessary that O'Brien have personally taken all of the amounts owed North Shore for it to be counted toward the loss. *See* 1995 U.S.S.G. § 2F1.1, comment. (n.8) ("The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss."). Under the Asset Purchase Agreement, Como Oil acquired O'Brien Oil's assets *without also assuming O'Brien Oil's liabilities*. Thus, while Como ultimately was forced to pay an additional $72,000 to clear up the liens on O'Brien Oil's assets, it never agreed to assume the company's liabilities to North Shore Oil. Indeed, O'Brien herself testified that, under the terms of the Asset Purchase Agreement, Como was entitled to receive the accounts receivable. Thus, since North Shore was not paid for any of the oil delivered to O'Brien Oil which made up the $40,928.83, nor did Como Oil agree to pay as part of its agreement with O'Brien Oil, the district court did not err in including that full sum in the loss calculation, even if O'Brien herself did not receive the full amount.[9]

9. O'Brien briefly alludes to two additional arguments which merit only summary discussion. First, she argues that, since the loss to North Shore was not set forth in the indictment, it should not have been included in sentencing. However, as this court stated in *United States v.*

*Ritsema*, 31 F.3d 559, 564–65 (7th Cir.1994), "The goal of including relevant conduct in sentencing is to allow a court to reflect in its sentence the actual seriousness of an offense, instead of strictly limiting it to the charge the prosecutor names in the indictment." Thus, the

## IV. CONCLUSION

We AFFIRM the district court in all respects.

judge was not prevented from taking the loss to North Shore into account in sentencing O'Brien simply because it was not mentioned in the indictment.

Second, she claims that the losses to North Shore were "consequential damages" which should not be included in the loss calculation. O'Brien's argument on this point misconstrues the nature of "consequential damages." Consequential damages are defined as "damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such

act.... Damages which arise from intervention of special circumstances not ordinarily predictable." *Black's Law Dictionary*, at 390 (6th ed.1990). In this case, there was ample evidence from which the court could, and did, conclude that the loss caused to North Shore Oil arose as a direct result of O'Brien's fraudulent scheme. The evidence showed that O'Brien Oil, in the weeks before the sale, began ordering larger quantities of oil from North Shore than it ever had before, and O'Brien took for herself part of the proceeds from the sale of that oil, while selling the remaining amounts due to Como Oil.