**Julie A. PICKENS, Plaintiff–Appellant,**

**v.**

**Marvin T. RUNYON, Postmaster General of the United States Postal Service, Defendant–Appellee.**

No. 96–3839.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1997.

Decided Nov. 4, 1997.

As Amended Dec. 2, 1997.

Ernest T. Rossiello (argued), Elena M. Dimopoulos, Rossiello & Associates, Chicago, IL, for Plaintiff–Appellant.

Thomas P. Walsh, Carole J. Ryczek (argued), Office of the U.S. Atty., Civil Division, Chicago, IL, for Defendant–Appellee.

Before CUMMINGS, COFFEY and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Julie A. Pickens sued the United States Post Office for race and sex discrimination, and a jury rejected her claim. The district court denied her motions for a new trial and for judgment as a matter of law. Pickens appeals.

Whether or not Ms. Pickens is reporting the truth about racial and sexual harassment at the United States Post Office in Chicago, she tells a sad story of medical and psychological traumas over the past several years. Pickens' allegations of harassment, however, are only a backdrop for this appeal which does not concern discrimination so much as it deals with whether she received a fair shake at trial. She says she didn't because the government failed, until the last minute, to produce critical discovery materials, and the absence of these materials robbed her of a chance to fairly present her best case to the jury.

Pickens and the Post Office present starkly different accounts of the facts underlying this case. Since the Post Office prevailed at trial, Pickens' story is suspect. For that reason, we would ordinarily, at this point, launch into a review of the facts from the Post Office's perspective because it won the battle at trial. But if the result—a verdict for the Post Office—can't be trusted because the jury didn't hear the full story, that's unfair to Ms. Pickens. So we will present facts from all perspectives so our ultimate decision can be better understood.

Pickens, white and in her late twenties, is a high school graduate, married, and the mother of three children. Apparently she has not led a happy life—before beginning work as a full-time letter carrier in July of 1990 she attempted suicide twice. She has not enjoyed her career with the Chicago Post Office either. Because of fears for her safety as a letter carrier she transferred out of several postal stations during the early 1990's, eventually ending up at the Riverdale station in late 1993.

When Pickens arrived at Riverdale she was placed on light duty because she was pregnant. She was one of only two white employees (and the only white woman) assigned to the station. All other employees at the station were black, and Pickens says she faced harassment as soon as she arrived. A number of employees commented, she said, that as a white person she "didn't belong there."

Several alleged early incidents of harassment, according to Pickens, involved James Field, a coworker. On one occasion Field asked Pickens, "Do you have any black in you?" She replied, "No, why?" He answered, "Let me give you some." Another time, Field said, "Why is it that white girls don't have any booty? You need a booty on your butt." Because of Field's comments, Pickens complained to her supervisor, Jeanette Wilson. Pickens claims that Wilson took no action regarding her complaints. At trial, Wilson testified that the other employees did not harass Pickens.

In September of 1994 Pickens returned from maternity leave and began full duty as a letter carrier. Upon her return, she alleges that a number of co-workers conspired to ensure that she had to take an undesirable route delivering mail at a housing project, Altgeld Gardens, predominantly occupied by blacks. According to Pickens, the black carriers, who had more seniority than she, bid on other routes in order to make the "white girl" cover Altgeld Gardens. Pickens learned of this plot, she said, during a phone call with Jewell Hightower, who said other employees pressured Hightower to bid on the only other route available to Pickens. Adding insult to injury, Pickens says her co-workers taunted her about how much fun the Altgeld residents would have with her.

Glenda Ford, another co-worker, teased Pickens, saying that in the summer she would become "dark like her" and that the Altgeld residents would think Pickens and Ford were "sisters."

At trial, however, Hightower testified that she did not engage in any conspiracy. She claimed she bid on the route she wanted because of safety concerns, not because of racial pressure to do so. Furthermore, Hightower claimed that she later offered to trade routes with Pickens, who refused.

In October of 1994 Samuel Hankins arrived at Riverdale as the new supervisor. His arrival, according to Pickens, marked the beginning of a new round of harassment. Various co-workers reportedly referred to Pickens as Hankins' "white girlfriend," a charge, says Pickens, that was not true. In any event, by November of 1994 Pickens began seeing a psychiatrist for treatment of depression. The psychiatrist prescribed Prozac.

On November 17, 1994, Pickens filed a complaint with the Post Office's internal EEO office. Although even Pickens says the harassment stopped for a few months at this point, she says it kicked in again in February of 1995. This time it focused on Hankins. On February 2, before beginning her route, Pickens realized that her delivery truck had no gas. Agitated over the fact that her truck was left without fuel, she reentered the station to tell Hankins of the problem. He allegedly grabbed her and said, "Ms. Pickens, calm down before I am forced to kiss you." Pickens said "I don't think so" and left. The next day, as she clocked out, Pickens says Hankins put his arm around her, professed his love for her, and told her that if she did not reciprocate he would kidnap her and run away with her. Pickens reported that during this incident Hankins smelled of alcohol. Hankins' conduct continued the following day when he cornered Pickens, grabbed her, hugged her, and attempted to "stick his tongue" in her mouth. She protested that she was married with three children and he responded by saying, "Well, Ms. Pickens, there is no strings attached." On February 6 this string of abusive incidents ended with Hankins apologizing to Pickens.

Pickens says she tried to cope with the situation by taking time off and altering her routine to avoid spending time at the station. On February 10, however, she could not restrain herself anymore. She erupted at her co-workers, telling them how angry she was with her working conditions and their treatment of her.

On February 17 Pickens dashed off a complaint to Rufus Porter, the Chicago postmaster. Porter eventually responded by releasing Pickens to seek a transfer to another station, but none, apparently, responded to Pickens' overtures. On February 22 Pickens met with an EEO counselor who advised her to transfer instead of pursuing a complaint. Pickens disagreed with this advice and filed a formal complaint. In the meantime, Hankins called her at home to ask her about her "problems."

Because of Pickens' complaint, Robert Rukes, a postal service investigator, conducted interviews at the Riverdale station. The investigation led to Hankins' admission that a "hugging and kissing incident" happened. In a written statement, Hankins said that he and Pickens did get close, hug, and that their faces touched. He claimed that the incident was consensual. Hankins received no discipline or reprimand because of the episode. Pickens learned that Rukes then turned the matter over to the EEO office for resolution.

During the spring of 1995 Pickens allegedly continued to suffer a steady stream of harassment, much of it focused on her EEO complaint. In April she overheard co-workers teasing the other white employee about his slim chances for a promotion. Someone said, "It's not who you know, it's who you blow."

The effects of the harassment, says Pickens, caused her to check into a hospital for depression. For 5 days, beginning on April 5, Pickens received treatment for her mental condition and two other conditions allegedly caused by stress—massive hair loss and vaginal bleeding. Upon her return from treatment, Pickens claims the harassment resumed. In addition, she says her co-workers began to ostracize her.

Pickens details several other incidents of harassment. On one occasion, when she inquired about a discussion of movies, Field told her that she wouldn't understand because it's a "black thing." Then he said, "Well, maybe you would understand. It's like when your butler doesn't show up." On another occasion, an employee told Pickens that she overheard Hankins referring to Pickens as his "white girlfriend."

Pickens also had problems with the programming on a radio station that played at Riverdale. She said the station regularly "slammed" white people. Pickens complained to Wilson, who told her to "just get headphones and ignore it." In June of 1995 Pickens attempted suicide. More treatment followed.

After treatment, Pickens again returned to Riverdale, although she continued to search for a transfer. In March of 1996 she found a suburban station, Crete, interested in taking her on. When she requested her release, however, she was told all transfers to the suburban system were frozen. Pickens claims that other employees who received job offers at the same time did manage to transfer despite the freeze.

In October of 1995 Pickens filed this suit. In December of 1995 she submitted a Rule 34 request for documents to the Post Office. Specifically, she requested production of any statements, her own and others, related to the litigation. The Post Office responded: "See Plaintiff's EEO file." While Pickens did obtain the full EEO file, the Post Office had erred. Another file contained documents-an investigative report on Pickens' 1995 complaint. Pickens did not learn of the existence of this second file until the day her trial began: July 29, 1996.

On the first day of the trial Pickens renewed her discovery request and the Post Office admitted that, while it had produced the contents of the EEO file, it had not produced the investigator's file. On Pickens' motion, Judge Leinenweber ordered production of the second file. Yvonne Coleman, the senior EEO complaint-processing specialist who assisted the Post Office's counsel with document production and who testified at trial, explained that she did not know that

she had to bring the investigative file with her. She promised to make the file available as soon as possible. When she sent the file to Pickens' counsel she attached a note explaining that she had not seen the investigative file until she obtained it on July 30.

In any event, on July 29, 25 minutes after the court's order, the Post Office handed Pickens a number of statements taken by Rukes from Pickens and other Riverdale employees. Pickens' counsel had not known of the existence of these documents. Pickens moved to have the documents excluded and to have Rukes precluded from testifying. This request was granted in part.

During the trial, Coleman testified regarding the Post Office's response to Pickens' complaint. She claimed she turned the matter over to one of the EEO staff, Darrow Andrews, after Rukes' investigation. Coleman also testified that Deloris James, the Post Office's manager of customer service operations, offered Pickens a transfer after the 1995 complaint but that Pickens refused. Coleman testified that standard procedure required that the full investigative file contain documentation of this offer.

During the afternoon of July 30 the Post Office delivered the investigator's file to Pickens' counsel's office. The Post Office claims in its brief that its counsel did not receive the file until this time as well. The Post Office alleges that the difficulty arose because the file had been in the possession of either the Postal Inspection Service or the Postal Service Labor Relations Department rather than EEO office.

The file contained 35 pages of documents, and it sat on Pickens' counsel's desk chair until 6 o'clock on the night of July 30, when court wrapped up for the day. The Post Office had just rested its case that afternoon, and Pickens' attorneys were preparing for closing arguments. They did not read the file or otherwise make use of any of its items of information during rebuttal the next morning. The case was then submitted to the jury.

Once the attorneys read the file, which happened after the jury spoke, they determined that it contained important information. In addition, they understood that someone at the Post Office must have had possession of the file because the exhibit-statements handed over on July 29 came directly from the file.

The file contained a memo dated April 21, 1995, that listed a number of actions recommended to resolve Pickens' complaint. The memo suggested a thorough investigation of the Riverdale station, it suggested that the Post Office "detail" Hankins to another station, that Hankins receive appropriate training on sexual harassment and on dealing with employee complaints, and that the Post Office evaluate Pickens' psychiatric condition and advise her on transfer procedures.

The file also contained a report by Rukes. The report included interview notes allegedly supporting Pickens' claims that she told her coworkers about Hankins' harassment immediately after it happened. The report included an entry explaining that Robert Smith, the manager of post office operations, and Ms. James agreed to "transfer Pickens to another station within James['] area, preferably a station with a female manager." Not only did Pickens not know of this agreement, she did not even know of the involvement of Smith and James. Finally, the report included an entry in which Wilson allegedly told Rukes that "some of the carriers had intentionally bid on certain routes in order to prevent Pickens from getting off her assignment [Altgeld Gardens] ... and that some of the female carriers were racially harassing Pickens." Rukes also reported, however, that Wilson told him she never witnessed Hankins "sexually harass Pickens or anyone, and that Hankins is a very quiet man." Wilson also told Rukes that "Pickens had a lot of personal problems" and that "Pickens never informed her of any problems of sexual harassment involving Hankins." And, interestingly, the report of what Wilson told Rukes is said to come from "Wilson's attached sworn handwritten statement" which actually contains nothing helpful to Pickens' case, like the statements we have just quoted.

The jury found for the Post Office on July 31, 1996. On August 15, 1996, Pickens submitted motions for a new trial and judgment as a matter of law. Judge Leinenweber denied the motions on October 9. The judge explained that the discovery violation would result in a new trial only if the late delivery of the investigative file prejudiced Pickens' ability to prove her case. He reasoned that the Post Office's failure to comply with discovery resulted in no prejudice because the file did not contain documents that would have benefited Pickens and because Pickens had the opportunity to introduce documents from the file on rebuttal but chose not to do so. The motion for a new trial was denied as was the motion for judgment as a matter of law, the latter on the grounds that the jury reached a reasonable verdict.

█ We reverse the denial of a motion for a new trial because of discovery violations only upon a finding that the movant was denied a fair trial. *See Brandt v. Vulcan, Inc.,* 30 F.3d 752, 758 (7th Cir.1994).

Pickens presents a straightforward argument. She contends that the investigative file would have allowed her to impeach Coleman and Wilson, it would have corroborated her claims, it would have caused her to depose Smith and James, and it would have helped her show that the Post Office took no remedial action after her 1995 complaint. For these reasons, she argues that the late production of the file prejudiced her and deprived her of a fair trial.

Pickens explains that Rukes' investigation notes would have allowed her to show that Wilson, contrary to her trial testimony, believed that some employees harassed Pickens. Rukes' notes would also support Pickens' claims of harassment by showing that she had told her co-workers of various incidents contemporaneous with those incidents. Perhaps most importantly, Pickens contends the file would have helped her show that the Post Office failed to take prompt action in response to her complaints.

While Pickens does not satisfactorily address her counsel's failure to introduce the file or information from it on rebuttal, this failure is not, as the Post Office suggests,

fatal. Once her counsel began the trial without the documents, he had chosen a strategy. To ask him to introduce documents discovered after resting his case would have, or could have, compelled him to modify his trial strategy to fit the Post Office's misconduct. So we decline the Post Office's request to fault Pickens' counsel for what he didn't do on the last morning of the trial.

The Post Office counters the rest of Pickens' contention with a zippy retort: "Pickens's argument to this Court turns upon itself like a Mobius strip." In either a fascinating effort at spin control or an accurate view of the situation, the Post Office argues that the documents in the investigator's file actually hurt Pickens' case, and thus, while the late production violated the discovery rules, it did not cause prejudice.

The Post Office walks through each of Pickens' claims. With regard to the impeachment of Wilson, the Post Office contends that even if Wilson did know that other employees discriminated against Pickens by outbidding her on route selection, Wilson could not have taken remedial action. The union contract controlled the bidding process and, since Pickens had the lowest seniority, the supervisor could not intervene and reassign routes.

The Post Office explains that the contentions about the freeze lack merit. The freeze would not have blocked the transfer because it was not in effect then and because it blocked only limited types of transfers.

Regarding the corroboration claim, the Post Office explains that the interview notes provide no independent confirmation of Pickens' allegations. They only bolster the contention that Pickens repeated her allegations widely.

 The Post Office notes that several of the items in the report either have a neutral or negative effect on Pickens' case. Several of the interview notes taken by Rukes would hurt Pickens' case because employees noted that she received special assistance with the Altgeld Gardens route and, during her February 10 outburst, Pickens yelled, "I can't trust none of these niggers." The April memo would hurt because it establishes that the Post Office transferred Hankins in response to Pickens' allegations regardless of what it told Hankins. The memo also would hurt because it injects the idea that the Post Office suspected that Pickens' fragile psychiatric state actually caused her to perceive harassment when none was present.

The Post Office contends that the investigative report really adds nothing to the admissions made by Hankins in his letter to Rukes—a letter Pickens did introduce at trial. Similarly, the Post Office claims that the April recommendations add nothing to matters covered at trial—the Post Office contends it took most of the remedial measures addressed in the memo and that the file supports the claim of prompt and comprehensive remedial action on Pickens' complaint.

 As one can see, this case involves a lot of facts but not much law. The law that guides us, however, is that we review the denial of a motion for a new trial only for an abuse of discretion by the trial judge. *Knox v. Indiana*, 93 F.3d 1327 (7th Cir.1996). We look to whether the verdict was against the weight of the evidence or if for other reasons the trial was not fair to the moving party. *Emmel v. Coca–Cola Bottling Co. of Chicago*, 95 F.3d 627 (7th Cir.1996). With these standards in mind, we note, of course, that Judge Leinenweber sat through the trial and was much closer to its nuances than we could ever be. He also conducted a post-trial hearing into the reasons why the investigator's file was not disclosed in a timely fashion, and he considered whether the contents of the file prejudiced Ms. Pickens. He found her arguments to be "seriously flawed." First, he noted that Pickens had not established that the information she received in the file would have buttressed her case. He found that the file really didn't help her and that it contained information leading one to conclude that she "has problems wherever she works." It was the judge's firm view that presenting information from the investigator's file would not have changed the verdict of the jury. We have closely reviewed the record in this case and we cannot say that Judge Leinenweber abused his discretion when he came to this conclusion. According-

ly, we will not disturb the order that this case need not be tried again. Similarly, the motion for judgment as a matter of law comes up dry. Even with the facts told from Pickens' point of view, no one could seriously argue that she presented such a compelling case that she deserves to win without going through the jury. Many of her claims seem somewhat hypersensitive, and other "evidence" upon which she relies (we have not detailed it all) seems to us to be more like poor taste rather than harassment.

Although we affirm Judge Leinenweber's decision, we hasten to add that the government was derelict in meeting its discovery obligations. For this reason, no costs are awarded.

AFFIRMED.