In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2382, 99-2424 & 99-2425

United States of America,

Plaintiff-Appellee,

v.

Raul Cruz-Velasco, Ramiro S. Trevino,
and Joseph L. Cuevas,

Defendants-Appellants.

Appeals from the United States District Court
for the Central District of Illinois, Urbana Division.
No. 97-CR-20037--Michael P. McCuskey, Judge.

Argued March 27, 2000--Decided August 17, 2000

Before Flaum, Chief Judge, and Posner and Williams,
Circuit Judges.

Flaum, Chief Judge. The defendants, Raul Cruz-Velasco, Ramiro S. Trevino, and Joseph L. Cuevas, were each convicted of one count of conspiracy to distribute more than one kilogram of heroin in violation of 21 U.S.C. sec. 846 and sec. 841(b)(1)(A)(i) and one count of possession of more than one kilogram of heroin with intent to distribute in violation of 21 U.S.C. sec. 841(a)(1) and sec. 841(b)(1)(A)(i). The defendants now appeal, alleging various errors on the part of the district court. For the reasons stated herein, we affirm the defendants' convictions and sentences.

I.  Background

The conduct for which the defendants were convicted and sentenced stems from two separate drug transactions. Those transactions occurred during the months of May and July of 1997.

1.  The May Transaction

During May 1997, defendant Cruz-Velasco stored approximately five kilograms of heroin behind a bar owned by Daniel Chavez in Edinburg, Texas. At a meeting between Chavez, defendant Cruz-Velasco, defendant Trevino, and Polo Garza, a bartender who worked for Chavez, defendant Trevino told

Chavez that he wanted the heroin moved to Dallas, Texas. Garza initially agreed to transport the drugs to Dallas, and defendant Cruz-Velasco stated that he would assist Garza by following him during the trip. Although defendant Trevino then proceeded to Dallas to await Garza's delivery, Garza never made the trip because he could not obtain access to a vehicle.

On May 16, 1997, defendant Trevino called Chavez from Dallas and inquired as to why Garza had not yet made the agreed-upon heroin delivery. Chavez stated that he did not know Garza's whereabouts and explained that it was his understanding that Garza was in Dallas. Subsequent to this telephone conversation, defendant Trevino visited Chavez at his bar and informed him that defendant Cruz-Velasco would pick up the heroin.

Shortly after defendant Cruz-Velasco picked up the heroin from Chavez, defendant Trevino again met with Chavez and told him that Jose Villanueva was willing to transport the heroin to Dallas. On May 19, 1997, defendant Trevino, defendant Cruz-Velasco, Chavez, and Villanueva met behind Chavez's bar. Defendant Cruz-Velasco brought the heroin with him to this meeting, and it was given to Villanueva in ten small packages. Villanueva then delivered the drugs to Dallas, arriving that same day.

When Villanueva arrived in Dallas, he met defendant Cruz-Velasco and defendant Trevino and the three men proceeded to a Dallas hotel. The next morning Villanueva gave the heroin to defendant Cruz-Velasco, who put the drugs in a white pickup truck and left. Villanueva was paid approximately $2,000 for this delivery.

On May 20, 1997, defendant Cuevas, Guizar, and Pablo Villamil flew from Chicago, Illinois to Dallas where they met defendant Cruz-Velasco. During this meeting, defendant Cruz-Velasco delivered the heroin in his possession to Villamil. Villamil then transported the heroin to Chicago on a Greyhound bus and, upon his arrival in Chicago, gave the heroin to an individual named Hector Castenada. Villamil received $8,500 for his services.

2.  The July Transaction

In late June or early July 1997, defendant Trevino hired Villanueva to transport five kilograms of heroin from McAllen, Texas to Chicago. Villanueva received ten packages of heroin from defendant Cruz-Velasco and was instructed by defendant Trevino to travel to an area approximately eighty miles outside of

Chicago. Villanueva left Texas on July 3, 1997 with the heroin hidden in his car.

When Villanueva arrived in Kankakee, Illinois on July 4, 1997, he was instructed to go to Room 310 at the Days Inn in Kankakee. While Villanueva was on his way to the Days Inn, he was stopped by a Kankakee County Sheriff's Department deputy. The deputy searched Villanueva's car and discovered one kilogram of heroin in a black duffel bag. Villanueva was arrested and taken to the Kankakee detention center.

Because of the quantity of drugs seized from Villanueva, the Kankakee County Sheriff's Department contacted the Kankakee Area Metropolitan Enforcement Group ("KAMEG"), a task force organized to investigate mid-to-upper level drug dealers. Members of KAMEG interviewed Villanueva, who informed them that there was an additional four kilograms of heroin hidden in his car. Villanueva also agreed to participate in a controlled sale.

After receiving instructions on the controlled sale, Villanueva went to Room 310 at the Days Inn where he met defendant Trevino and defendant Cruz-Velasco. After a brief conversation about the drug transaction that was to take place, Villanueva was instructed to drive to a Knights Inn in Kankakee and wait. Members of KAMEG followed Villanueva to the Knights Inn and gave him further instructions on the controlled sale.

Approximately five minutes after Villanueva left the Days Inn, members of KAMEG observed defendant Cuevas and Hector Castenada approach Room 310. Defendant Cuevas carried a medium-sized gym bag in his hand. When defendant Trevino answered the door of Room 310, defendant Cuevas and Castenada went inside. At approximately 2:17 p.m., law enforcement officials observed defendant Cruz-Velasco and Castenada leave Room 310. Neither man was carrying anything.

Defendant Cruz-Velasco and Castenada then proceeded to the Knights Inn, where they received a bag containing heroin from Villanueva. Following this exchange, defendant Cruz-Velasco got in Villanueva's car. Castenada drove away unaccompanied. Villanueva and defendant Cruz-Velasco then returned to the Days Inn, and defendant Cruz-Velasco commented that the delivery had been easy.

After exiting Villanueva's car, defendant Cruz-Velasco returned to Room 310 at the Days Inn. A few minutes later, defendant Cuevas left the Days Inn in a black Mercedes-Benz. He was followed by an unmarked police car. After several minutes in

which defendant Cuevas exited the highway multiple times and appeared to be attempting to evade the undercover police officer who was following his car, a traffic stop was initiated by a uniformed officer and defendant Cuevas was arrested.

At the same time that defendant Cuevas was being followed, a sheriff's deputy stopped Castenada's vehicle and arrested him. Upon a search of Castenada's vehicle, five kilograms of heroin were discovered. Defendant Trevino and defendant Cruz-Velasco were then arrested at the Days Inn, and a search of the room revealed $22,510 in cash, as well as notes, articles of clothing, and a number of pagers. Defendant Cruz-Velasco, defendant Cuevas, defendant Trevino, and Castenada were all interviewed by KAMEG, but none of them admitted involvement in the drug trafficking of which they were suspected.

3.  The Trial

The defendants were charged in a two-count superseding indictment with one count of conspiracy to possess with intent to distribute more than one kilogram of heroin and one count of possession of more than one kilogram of heroin with intent to distribute. After a jury trial, all three defendants were convicted on both counts. On May 21, 1999, the defendants were sentenced to 151 months imprisonment, a five-year period of supervised release, and a mandatory special assessment of $200. In addition, defendant Cuevas was fined $300,000. The defendants now appeal, arguing that the district court made various errors during both the guilt and sentencing phases of trial.

II.  Analysis

The defendants' cases were consolidated both for purposes of trial and appeal. Although the various issues raised by each defendant overlap, they are not identical. We therefore consider each defendant's contentions separately. However, to the extent the defendants adopt the arguments made by their co-appellants, the analysis of the individual claims applies to all the appellants to whom those issues are applicable.

A.  Defendant Ramiro S. Trevino
1.  The Expert Testimony of DEA Agent Joseph Reagan

During the defendants' trial, the government called DEA Agent Joseph Reagan to the stand to testify as an expert witness about the nature, structure, and characteristics of drug trafficking operations. Defendant Trevino now

argues that in admitting this testimony, the district court failed to apply the proper standard for the admission of expert testimony as enunciated by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). We review whether the district court properly followed the Daubert framework in considering the admissibility of expert testimony de novo, see United States v. Hall, 165 F.3d 1095, 1101 (7th Cir. 1999), but we review the district court's decision to admit Agent Reagan's testimony for an abuse of discretion, see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); United States v. Clark, 192 F.3d 750, 756 (7th Cir. 1999).

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to determine a fact in issue" an expert "may testify thereto." Fed.R.Evid. 702. The Supreme Court has made clear that in applying Rule 702, district courts serve a gatekeeping function and must ensure that the expert testimony at issue "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597; see Kumho, 526 U.S. at 147. Although the Daubert Court identified a number of factors to be considered when evaluating the admissibility of expert testimony--including testing, peer review, error rates, and acceptability within the relevant professional community--these factors do not establish a definitive checklist. See Kumho, 526 U.S. at 150; Daubert, 509 U.S. at 593. Rather, the applicability of the various Daubert factors depends on the particular facts and circumstances of each case. See Kumho, 526 U.S. at 150; Daubert, 509 U.S. at 591.

The government argues that the district court properly understood the analytical framework of Daubert, and demonstrated that it was applying the proper standard, when it stated, "I will allow . . . the agent to proceed, one, assuming that he will be qualified as an expert, and then, two, into relevant inquiry." We agree that this reflects the district court's understanding that in order to be qualified, an expert witness's testimony must be both reliable and relevant. Furthermore, after the government laid a proper foundation for Agent Reagan's testimony, the district court explicitly indicated that he was qualified as an expert witness and the defendants failed to object to that finding. It is well-settled that the methods and structure of narcotics trafficking is a proper source of expert testimony. See United States v. Mancillas, 183 F.3d 682, 704-06 (7th Cir. 1999); United States v. Navarro, 90 F.3d 1245, 1261 (7th Cir.

1996) ("Law enforcement officers . . . may qualify as experts in narcotics trafficking and may offer explanations to the jury."); United States v. Lipscomb, 14 F.3d 1236, 1239-43 (7th Cir. 1994); United States v. Brown, 7 F.3d 648, 652 (7th Cir. 1993) (collecting cases); United States v. Foster, 939 F.2d 445, 451 (7th Cir. 1991); United States v. Solis, 923 F.2d 548, 550-51 (7th Cir. 1991). It is also clear from his experience that Agent Reagan was qualified to offer testimony as to the general structure of drug organizations and that his testimony regarding drug trafficking was helpful to the jury. Under these circumstances, we are satisfied that the district court properly applied the Daubert framework in considering the testimony of Agent Reagan. Defendant Trevino's general objections to the testimony of Agent Reagan are therefore unavailing.

Defendant Trevino's more specific objection to Agent Reagan's testimony does not focus on his qualifications in general, but rather on what the defendant characterizes as testimony about the nature and characteristics of Hispanic drug dealers. According to defendant Trevino, this kind of testimony is problematic for two reasons. First, defendant Trevino argues that Agent Reagan was not qualified to testify about Hispanic drug organizations because his relevant investigative experience did not center on Hispanics or on Hispanic areas. Second, defendant Trevino argues that Agent Reagan's testimony about Hispanic drug dealers improperly introduced ethnicity into the trial and should not have been admitted because it was too prejudicial. While we recognize that testimony about the relevant characteristics of particular ethnic groups could be problematic, and we agree that Agent Reagan's experience did not qualify him to speak authoritatively on the particular characteristics of Hispanic drug trafficking organizations, defendant Trevino's argument as to the nature of Agent Reagan's testimony is not supported by the record.

Agent Reagan's testimony centered on drug trafficking operations generally and he drew no distinctions between Hispanic drug traffickers and drug traffickers of any other race or ethnic origin. In fact, Agent Reagan's only reference to Hispanic drug dealers during the entire course of his testimony was an acknowledgment that in the past he had investigated Hispanic drug trafficking organizations. Nothing about Agent Reagan's testimony indicates an ethnically-based evaluation of the evidence, nor was there any attempt by Agent Reagan or the government to interject the potentially prejudicial issue of ethnicity into the witness's testimony. Accordingly, we find no error in the district

court's decision to qualify Agent Reagan as an expert and to admit his testimony regarding drug trafficking organizations.

2.  The Alleged Suppression of Impeachment Evidence

Defendant Trevino next challenges the failure of the government to turn over impeachment evidence concerning Daniel Chavez. Chavez was an informant who testified during the government's case-in-chief regarding defendant Trevino's involvement in drug trafficking activities. Although Chavez admitted on cross-examination that he had been paid money by the government for his services as an informant, the records of these payments were never tendered to the defense. Defendant Trevino contends that these government payments to Chavez constitute impeachment evidence of an important government witness demonstrating bias and that, because of the nature of that evidence, the government had an obligation to inform the defense of the payments and to turn over any records regarding those payments to defendant Trevino.

The government has an obligation to disclose evidence favorable to the defendant upon request when such evidence is material to the defendant's guilt or innocence, see Brady v. Maryland, 373 U.S. 83, 87 (1963), and that obligation extends to both impeachment and exculpatory evidence, see United States v. Bagley, 473 U.S. 667, 676 (1985) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)). In this case, the government argues that it was not required to give defendant Trevino information about the payments made to Chavez because those payments were not relevant to the instant case. More specifically, the government contends that the district court judge previously assigned to this case determined that the payments made to Chavez were unconnected to the government's investigation of these particular defendants and that this ruling affirmatively relieved it of its obligation to turn the disputed evidence over to the defense. In order to evaluate this argument, we must consider the somewhat unusual events surrounding the determination that the payments made to Chavez were not relevant to this case.

The evidence regarding the government's payments to Chavez was first presented by DEA agents in an in camera hearing to Judge Baker, the district judge previously assigned to this case. This hearing took place outside the presence of defense counsel and there is no indication in the record as to what was discussed during this meeting or as to what information was provided to Judge Baker. The record does reflect that

following this meeting, Judge Baker issued an order stating that evidence of the government's payments to Chavez was inadmissible at the defendants' trial based on the court's conclusion that the payments made to Chavez were related to a wholly separate DEA investigation. The district court accepted Judge Baker's determination that the disputed evidence was irrelevant, and the government now argues that Judge Baker's ruling as to this potentially impeaching evidence relieved it of its obligation under Brady to turn the requested impeachment evidence over to the defense.

We agree with the government that no Brady violation occurred here. The information regarding evidence of the government's payments to Chavez was provided to Judge Baker and it was determined to be irrelevant. Because the government is only required to turn over requested information if it is material to an issue at trial, see Brady, 373 U.S. at 87; United States v. Hartbarger, 148 F.3d 777, 786 (7th Cir. 1998), the district court's determination that the requested evidence was irrelevant necessarily relieved the government of its obligation to turn over information concerning Chavez's dealings with the government because irrelevant evidence cannot be material. Put another way, the central Brady inquiry on appeal is whether there is a reasonable probability that the disputed evidence would have affected the result at trial, see Bagley, 473 U.S. at 682; United States v. Dimas, 3 F.3d 1015, 1018 (7th Cir. 1993), and we cannot say that there is a reasonable probability that evidence properly found to be irrelevant would have affected the jury's conclusions. The question then is not whether the government violated its Brady obligation when it refused to turn over the information regarding its payments to Chavez that had been deemed irrelevant by Judge Baker, but rather whether the district court erred in making its initial materiality determination as to the disputed evidence. We review the district court's determination that the disputed evidence was not material under Brady for an abuse of discretion. See United States v. Kozinski, 16 F.3d 795, 818 (7th Cir. 1994).

In circumstances where the defense seeks access to confidential information during discovery, "we rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as [those of] the government." United States v. Phillips, 854 F.2d 273, 277 (7th Cir. 1988) ("Generally, the decisions whether to conduct an in camera review of government files in appropriate cases, whether to require discovery of materials contained therein, and in

what form such materials should be produced are committed to the sound discretion of the district judge."). While we recognize this broad grant of authority to district judges,/1 it is impossible for us to determine on the record as it now stands whether the district court properly exercised its discretion in refusing defense requests to turn over information regarding the payments to Chavez. There is no information in the record as to the substance of the meeting between Judge Baker and the DEA agents, nor is there any information supporting Judge Baker's determination that the disputed evidence was irrelevant. Judge Baker's docket order deeming the evidence irrelevant, coupled with the district court's decision to rely on that previous finding, do not provide a sufficient basis for evaluating the district court's decision to deny defendant Trevino discovery of the disputed information.

Despite our conclusion that the district court did not provide a sufficient explanation of its decision to exclude records of the government payments to Chavez, defendant Trevino has not convinced us that the disputed evidence was material. See United States v. Hamilton, 107 F.3d 499, 510 (7th Cir. 1997) (citing United States v. Agurs, 427 U.S. 97, 109-10 (1976)) ("[A] Brady violation does not arise due to nothing more than a possibility that the undisclosed item might have helped the defense . . . ."). In order to demonstrate materiality, defendant Trevino must show both an abuse of discretion and prejudice. See United States v. Salerno, 108 F.3d 730, 743 (7th Cir. 1997) (quoting United States v. Alvarez, 987 F.2d 77, 85 (1st Cir. 1993)) (stating that discovery violations warrant a new trial only when both an abuse of discretion and prejudice are shown); see also United States v. Miller, 199 F.3d 416, 421 n.3 (7th Cir. 1999). In this context, prejudice means a showing that because of the absence of the sought-after evidence, defendant Trevino did not "receive[ ] a fair trial resulting in a verdict worthy of confidence." United States v. Asher, 178 F.3d 486, 496 (7th Cir. 1999) (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)); see Pickens v. Runyon, 128 F.3d 1151, 1155 (7th Cir. 1997). Prejudice exists when the defendant "is unduly surprised and lacks an adequate opportunity to prepare a defense, or when the violation substantially influences the jury." United States v. De La Rosa, 196 F.3d 712, 716 (7th Cir. 1999).

During cross-examination, the district court allowed the defendants to inquire into Chavez's work as a government informant, and Chavez admitted that he had been paid for his services. Although defendant Trevino admits that he was

able to question Chavez about the fact of government payments, he contends that he was not able to explore sufficiently the nature, and specifically the amounts, of the payments made to Chavez without access to the records of those payments. Under these circumstances, however, defendant Trevino has not shown that the district court's refusal to allow additional inquiry into the government payments received by Chavez resulted in an unfair trial, or that the evidence he sought to obtain discovery of was anything more than cumulative impeachment evidence. See United States v. Maloney, 71 F.3d 645, 653 (7th Cir. 1995) (citing Kozinski, 16 F.3d at 819) (stating that in order to justify a new trial, impeachment evidence "must be more than mere cumulative impeachment"); United States v. Dweck, 913 F.2d 365, 371 (7th Cir. 1990). Because defendant Trevino has failed to show that he was prejudiced by the government's failure to turn over records regarding the government payments to Chavez, we will not disturb the ruling of the district court below.

3.   Sentencing Issues

Defendant Trevino next argues that the district court erroneously failed to grant him downward departures based on his age, family circumstances, and the hardship faced by his family because of his status as an illegal alien. Although defendant Trevino failed to request such downward departures before the sentencing court, he now argues that this Court may nevertheless review his claims under a plain error standard. Defendant Trevino also alleges that his failure to request these departures resulted from the ineffective assistance of his trial counsel and he argues that this Court should consider that claim on appeal as well.

We find both of defendant Trevino's sentencing arguments to be meritless. A district court's decision not to depart downward is reviewable on appeal only if the district court's conclusion is based on a legal interpretation of the Sentencing Guidelines. See United States v. Ekeland, 174 F.3d 902, 905 (7th Cir. 1999); United States v. Poff, 926 F.2d 588, 591 (7th Cir. 1991). On appeal, defendant Trevino does not challenge the district court's legal conclusions, nor is there any indication that the district court did not believe it had the discretion to depart. Rather, defendant Trevino challenges the district court's factual findings and its discretionary decision not to depart. Such challenges are not subject to appellate review, even in circumstances where a motion for departure has been made before the district court, and we therefore do not have jurisdiction to consider defendant Trevino's

arguments as to the district court's failure to depart downward. See United States v. Williams, 198 F.3d 988, 994-95 (7th Cir. 1999) ("[A] district court's discretionary decisions concerning upward or downward departures are not reviewable by this Court."); United States v. Helton, 975 F.2d 430, 434 (7th Cir. 1992).

In order to prevail on his ineffective assistance of counsel claim,/2 defendant Trevino must demonstrate both that his attorney's performance was objectively unreasonable and that he was prejudiced by that performance. See United States v. Partee, 31 F.3d 529, 534 (7th Cir. 1994). According to defendant Trevino, he has made the necessary performance and prejudice showings through proof that his trial counsel failed to move for the applicable downward departures without any strategic justification. Although the appellate record clearly reflects that defendant Trevino's trial counsel did not ask for the downward departures that defendant Trevino now claims should have been requested, the record does not reveal the circumstances surrounding that decision or the strategic concerns that may have motivated it. See United States v. Johnson-Wilder, 29 F.3d 1100, 1104 (7th Cir. 1994) (noting that ineffective assistance claims should almost never be brought on direct appeal because "typically the trial record will be silent about the reasons for actions taken by trial counsel"). Absent a showing that trial counsel chose not to ask for an obviously applicable departure without any justification for his actions, we cannot conclude that his performance was objectively unreasonable. We therefore reject defendant Trevino's ineffective assistance of counsel claim.

B. Defendant Joseph L. Cuevas

The appeal of defendant Joseph L. Cuevas focuses on the testimony of Pablo Villamil, a rebuttal witness called by the government. Villamil testified that he participated in a "drug run" with defendant Cuevas, and that as part of this venture he accompanied defendant Cuevas and Emilio Guizar on a May 20, 1997 flight from Chicago to Dallas. This testimony was particularly damaging to defendant Cuevas because Villamil was called to refute the innocent explanation defendant Cuevas gave for that trip. In addition, Villamil rebutted defendant Cuevas's statement that he and Guizar traveled alone to Dallas on the flight in question. The government further attempted to damage defendant Cuevas's credibility by introducing flight manifests showing that, despite defendant Cuevas's assertion to the contrary, defendant Cuevas, Guizar, and Villamil were all on a Vanguard Airlines flight from Chicago to Dallas on May 20,

1997. We review the district court's decision to admit rebuttal testimony for an abuse of discretion. See Spesco, Inc. v. General Elec. Co., 719 F.2d 233, 239-40 (7th Cir. 1983).

Defendant Cuevas's allegations of error in regard to the testimony of Villamil focus on what he regards as the unfair surprise created when the government called Villamil in rebuttal after having failed to offer him as a witness in its case-in-chief. It is well-established, however, that there is no constitutional right to discovery in non-capital criminal cases and that the prosecution has no constitutional obligation to reveal its witnesses prior to trial. See Weatherford v. Bursey, 429 U.S. 545, 559 (1977); United States v. Agyemang, 876 F.2d 1264, 1270 (7th Cir. 1989). More significantly, there is no allegation that the government failed to comply with any discovery rule in not disclosing the possibility that Villamil would testify as a rebuttal witness. See, e.g., United States v. Braxton, 877 F.2d 556, 560 (7th Cir. 1989). Villamil's testimony only became necessary when defendant Cuevas denied having been accompanied to Dallas by Villamil, and the government was entitled to call Villamil to rebut that testimony and to attack defendant Cuevas's credibility. See United States v. O'Brien, 119 F.3d 523, 530 (7th Cir. 1997) ("Once a defendant takes the stand and denies his criminal activity, it is proper for the district judge to permit the Government to offer rebuttal evidence in contradiction of that testimony."). Because the government had no legal duty to disclose the identity of its potential rebuttal witnesses, and because defendant Cuevas put his credibility at issue by testifying in his own defense, the district court properly allowed Villamil to testify.

Although precedent establishes that the government was not required to disclose the identity of Villamil as a rebuttal witness, the government's failure to turn over the Vanguard Airlines passenger list is more problematic. This case was conducted under an open discovery policy, and the government was clearly obligated to disclose the passenger list to the defense as soon as it was received. The government did not comply with this obligation, nor did it offer any valid justification for this failure before the district court or on appeal. These kind of discovery violations are troubling in any context, but particularly so when they are committed by the government during a criminal trial. However, it is significant that the district court properly recognized the government's error and prohibited the government from using the airline passenger list to rebut defendant Cuevas's testimony or to corroborate

Villamil's testimony. District courts are generally given discretion to fashion remedies for discovery violations, see Fed.R.Crim.P. 16(d)(2), and we will not second-guess that decision absent a showing that, on the particular facts of this case, the district court abused that discretion. See United States v. Beverly, 913 F.2d 337, 355 (7th Cir. 1990); see also Taylor v. Illinois, 484 U.S. 400 (1988).

A new trial is warranted for a discovery violation only if "'the remedy offered by the district court was inadequate to provide [the defendant] with a fair trial.'" United States v. Jackson, 51 F.3d 646, 651 (7th Cir. 1995) (quoting United States v. Mounts, 35 F.3d 1208, 1217 (7th Cir. 1994)). In this case, defendant Cuevas argues that the district court's decision to exclude the airline passenger list, but to permit Villamil to testify on rebuttal, was inadequate to ensure that he was provided a fair trial. Defendant Cuveas contends that the government acted in bad faith and intentionally withheld the airline passenger list in order to conceal the possibility that Villamil might testify and that this act of deception fundamentally altered his trial strategy. Defendant Cuevas also argues that the district court erred in not granting his request for a continuance so that he could more adequately prepare for the testimony of this surprise witness.

As we have previously discussed, we do not believe that the district court abused its discretion in its management of the discovery issues when those issues are examined in isolation. The district court properly permitted the government to call Villamil as a witness, and the district court exercised its discretion to remedy discovery abuses by excluding the airline passenger list that was not tendered to the defense. Because neither of these decisions constitute error when examined separately, defendant Cuevas's claim relies on a link between the failure of the defense to provide the airline passenger list and the detriment he suffered when Villamil was called as a rebuttal witness to attack his credibility. According to defendant Cuevas, had he properly received the airline passenger list from the government, he would have known of the possibility that Villamil would be called to testify and would have altered his trial strategy accordingly (presumably by not testifying himself or by admitting Villamil's presence on the May 20, 1997 flight)./3 Under this theory, the only adequate remedy for the government's failure to disclose the existence of the airline passenger list would have been to exclude both the list itself and the rebuttal

testimony of Villamil.

Although we reiterate our concern about the government's failure to turn over the airline passenger list to the defense, we do not believe that the district court erred in fashioning a remedy for that violation. The passenger list would have shown that the government was aware of the passengers on the May 20, 1997 flight to Dallas, but it would not have given Cuevas any indication that Villamil was prepared to testify that he accompanied Cuevas to Dallas. The notion that mere possession of the airline passenger list would have led to the conclusion that Villamil would be called to testify and that this realization would have altered Cuevas's trial strategy is too speculative to demonstrate that the district court should have excluded Villamil's testimony or that defendant Cuevas was prejudiced by the government's actions. See United States v. Salerno, 108 F.3d 730, 748 (7th Cir. 1997) (quoting United States v. Alvarez, 987 F.2d 77, 85 (1st Cir. 1993)). In the absence of a more concrete showing that disclosure of the airline passenger list would have impacted defendant Cuevas's trial strategy, or some evidence that the government acted in bad faith in withholding that information, we cannot say that the district court abused its discretion in choosing to remedy the government's discovery violation through exclusion of the undisclosed evidence.

In addition to his arguments concerning the district court's failure to adequately remedy the discovery violation committed by the government, defendant Cuevas also contends that the district court erred when it refused to grant him a continuance to prepare for Villamil's testimony. While we agree that the district court had the discretion to grant defendant Cuevas a continuance, see United States v. United Pacific Ins. Co., 427 F.2d 366, 373 (7th Cir. 1970) ("[A]n application for a continuance is addressed to the sound discretion of the trial court . . . ."), we do not believe that defendant Cuevas has demonstrated that a continuance was mandated by the circumstances of this case or that the district court abused its discretion in refusing to grant one. See United States v. $94,000.00 in United States Currency, 2 F.3d 778, 787 (7th Cir. 1992) ("We review the trial court's denial of a continuance for abuse of discretion."). We base this conclusion primarily on defendant Cuevas's failure to show that a continuance was necessary in order for him to prepare for Villamil's testimony and on his inability to demonstrate that the government's actions in calling Villamil as a rebuttal witness prejudiced his defense. See United States v. Avery, 208 F.3d 597, 602 (7th

Cir. 2000).

Before Villamil was allowed to testify, the district court ensured that defendant Cuevas was able to interview him, and the record reflects that defendant Cuevas had ample opportunity at trial to cross-examine Villamil on both his credibility and his motive for testifying. Although defendant Cuevas now says that had he known of the possibility that Villamil would be called to testify he would have sought additional information in preparation for that testimony--including taking pictures of the Vanguard airlines ticket counter in Chicago, investigating the airline's boarding and ticketing procedures, taking pictures at the Dallas airport, investigating rental car procedures in Dallas, investigating bus routes from Dallas to Chicago, ascertaining whether there was a record of a bus ticket for Villamil, and investigating Villamil's employment--defendant Cuevas does not indicate how this additional information would have aided his cross-examination of Villamil. Moreover, much of the further investigation sought by defendant Cuevas involved places and events already known and relevant to the defense's case even before Villamil became involved. Against this backdrop, we cannot conclude that the district court abused its discretion in refusing defendant Cuevas's request for a continuance. See Pfeil v. Rogers, 757 F.2d 850, 856 (7th Cir. 1985) ("Absent an abuse of discretion, the trial court's determination of whether a continuance is justified will not be interfered with by an appellate court.").

C.  Defendant Raul Cruz-Velasco

Defendant Raul Cruz-Velasco alleges that the district court erred in allowing the government to present a revised written transcript of a tape-recorded conversation between defendant Cruz-Velasco and government informant Jose Villanueva. The original transcript of this conversation was turned over to the defense well in advance of trial as part of discovery, but on the eve of trial the government provided the defense with a revised version of that transcript. Although the government contends that the revised transcript only contained translations of portions previously thought inaudible, defendant Cruz-Velasco argues that the modifications made to the transcript were significantly prejudicial to his defense and justify overturning his conviction. According to defendant Cruz-Velasco, the government's delay in providing up-to-date transcripts should have resulted in a prohibition on the use at trial of the newly-provided transcripts.

Although this issue again raises general problems regarding the ability of defendant Cruz-Velasco to react to evidence turned over late in the discovery process, our concerns in that regard are alleviated upon an examination of the circumstances surrounding the revised transcript. The delay in turning over the modified translations was not due to the fault of the government, but rather to the inability of the government to review the accuracy of the original transcript with the relevant witnesses until shortly before trial. Apart from the transcript itself, the defense was provided a copy of the actual tape-recorded conversation and had ample opportunity to seek its own translation. Furthermore, upon hearing that the government provided new transcripts near the start of trial, the district court gave defendant Cruz-Velasco the opportunity to cross-examine the government's expert witness on the modifications to the transcript and informed defendant Cruz-Velasco that he would be permitted to call his own expert challenging the government's version of the translated conversation. When a defendant is given both the time and the opportunity to address any problems created by a new transcript and to present an alternate version, the district court's refusal to exclude the new translation is not an abuse of discretion. See United States v. Zambrana, 864 F.2d 494, 497-98 (7th Cir. 1988) ("'Because the [defendant] had ample opportunity to either challenge specific portions of the government's transcript or to prepare an alternate version,' he cannot now complain on appeal when he failed to pursue those avenues at trial.") (quoting United States v. Zambrana, 841 F.2d 1320, 1335 (7th Cir. 1988)); United States v. Llinas, 603 F.2d 506 (5th Cir. 1979).

III.  Conclusion

Having reviewed the issues arising from the defendants' convictions and sentences and finding no reversible error, we AFFIRM the decisions of the district court.


/1 Defendant Trevino also contends that the district court's failure to order discovery on the information regarding government payments to Chavez, as well as the court's refusal to allow the defendants to pursue a detailed inquiry as to the nature and source of the payments on cross-examination, violated his Sixth Amendment right to confront the witnesses against him. It is true that defendant Trevino has a right to confront the witnesses against him, but that right is not unlimited. See United States v. Rainone, 32 F.3d 1203, 1207 (7th Cir. 1994). The trial court retains broad discretion to limit cross-

examination, see United States v. Valles, 41 F.3d 355, 359 (7th Cir. 1994), and the district court properly exercised that discretion in this case. Because defendant Trevino was able to adequately question Chavez as to the fact of the government payments, the district court's refusal to allow more detailed questioning on that subject does not constitute a denial of defendant Trevino's Sixth Amendment rights.

/2 Although ineffective assistance of counsel claims may be considered as a part of this appeal, we have consistently recognized that this type of claim is disfavored on direct review. See United States v. Cooke, 110 F.3d 1288, 1299 (7th Cir. 1997) ("This Court's reluctance to consider ineffective assistance claims on direct appeal stems, of course, from the fact that such claims are very unlikely to find any factual support in the trial record and an adverse determination on direct appeal will be res judicata in any subsequent collateral attack."); see also United States v. Garrett, 90 F.3d 210, 214 (7th Cir. 1996); United States v. Walls, 80 F.3d 238, 243 (7th Cir. 1996).

/3 Defendant Cuevas attempts to establish that the district court's remedy for the government's discovery violation was inadequate by linking the government's failure to disclose the airline passenger list to the detriment defendant Cuevas suffered when Villamil was permitted to testify as a rebuttal witness. In this regard, it is significant to note that the government's nondisclosure of the airline passenger list and the government's decision to call Villamil as a rebuttal witness were argued as separate and distinct issues before the district court. It is only on appeal that defendant Cuevas connects these issues in an attempt to demonstrate prejudice.

Williams, Circuit Judge, dissenting in part. I dissent from the majority opinion in two respects.

First, unlike my colleagues, I do not believe that the district court adequately remedied the government's discovery violation. I agree that the district court has the discretion to determine the appropriate sanction for a Federal

Rule of Criminal Procedure 16/1 violation and that this court will not disturb the district court's ruling absent a showing of unremedied prejudice. "A defendant is prejudiced under Rule 16 only when he is unduly surprised and lacks an adequate opportunity to prepare a defense, or when the violation substantially influences the jury." United States v. De La Rosa, 196 F.3d 712, 716 (7th Cir. 1999).

The question here is whether the loss of a potential defense strategy as the result of a discovery violation creates enough prejudice to require a new trial. This is an issue of first impression for our circuit. In a similar case from the Eleventh Circuit, the defendant challenged his conviction on the ground that the district court admitted into evidence a tape recording of the defendant on rebuttal even though the government had failed to turn over the tape during pretrial discovery. See United States v. Noe, 821 F.2d 604, 607 (11th Cir. 1987). In response, the government suggested that it could withhold discoverable inculpatory evidence until the defendant asserted a defense strategy based on the apparent nonexistence of that evidence, thus foreclosing other, possibly viable, defense strategies. See id. at 608. The Eleventh Circuit refused to adopt the government's suggestion because "it would encourage precisely the 'trial by ambush' that the Federal Rules of Criminal Procedure were designed to prevent." Id. Consequently, the Noe court granted the defendant a new trial. See id. at 609.

In the case at bar, the government claims that a defendant simply does not have the right to lie under oath with impunity on the belief that the government will not be able to prove otherwise because he has not been given prior notice of a rebuttal witness' identity. The government, however, misses the point. The issue here is about a fair trial, not Cuevas's credibility. The Noe court addressed a similar argument.

The government's appeals to "justice" to uphold Noe's guilty verdicts are misplaced. Although Noe certainly does not have the right to "fabricate" an alibi story, the Federal Rules of Criminal Procedure provide him a right . . . to devise a defense strategy on the basis of the evidence disclosed. . . . Had the government . . . complied fully with Noe's discovery request . . . ., it would not now be before this court invoking vague notions of justice. Likewise, had Noe been aware of the tape recordings prior to trial, his counsel "might well have advised [him] not to take the stand." United States v. Padrone, 406 F.2d 560, 561 (2d Cir. 1969). The government, however, failed to comply with Noe's discovery

request and did not disclose the tape recording until after Noe had developed and implemented his trial strategy. Consequently, the government cannot now claim that the discovery violation was harmless.

Id. (emphasis added).

In our case, the district court's sanctions were insufficient in my view. A new trial is warranted when the failure to disclose "is so serious a detriment to the preparation for trial and the defense of serious criminal charges [and] where it is apparent, as here, that [the defendant's] defense strategy may have been determined by the failure to comply." Padrone, 406 F.2d at 561. The government does not provide any valid reasons for not disclosing the airline report and appears to have acted in bad faith. Moreover, Cuevas's trial strategy was significantly prejudiced by the "ambush." See United States v. Camargo-Vergara, 57 F.3d 993, 998-99 (11th Cir. 1995) (finding that the government substantially prejudiced the defendant's case by its failure to disclose a portion of the defendant's statement until after trial started because defendant had already prepared and committed himself to a trial strategy).

While the majority urges us to look at the airline manifest and Villamil's testimony in isolation, I do not believe that we can. The government apparently learned of Villamil's identity through the subpoenaed manifest. Consequently, he would not have been a rebuttal witness without the government's review of that manifest. Because the government's rebuttal case was built upon knowledge gained from those records, the banned records were "just as effective as if [they] had been introduced in evidence." United States v. Rodriguez, 799 F.2d 649, 654 (11th Cir. 1986). Villamil's testimony was especially damning. He was the only "inside" government witness to claim that he met and dealt with Cuevas during the alleged conspiracy.

If the government had timely turned over the airline flight manifest or ticket records--the government received these documents on the first day of trial, Cuevas may have exercised his constitutional right not to testify. At a minimum, Cuevas should have had an opportunity to properly investigate and prepare a cross-examination strategy.

I also dissent from my colleagues' conclusion regarding the suppression of impeachment evidence concerning Daniel Chavez. I do agree that the government did not commit a Brady violation and

that the central question here is whether the district court erred in making its initial materiality determination as to the disputed evidence. I am, however, troubled by the unusual events surrounding the determination that the payments made to Chavez were not relevant to this case.

Ordinarily, we rely on the sound discretion of the district judge whether to conduct an in camera review of government files. See United States v. Phillips, 854 F.2d 273, 277 (7th Cir. 1988). Here we cannot, however, determine on the record whether the district court properly exercised its discretion. Unlike the situation in Phillips, no record or transcript was prepared of the ex parte in camera hearing between the district judge and the government officials./2 Furthermore, all we have is the district judge's conclusory opinion that the payments made to Chavez were related to a separate investigation.

A jury is entitled to know all the details of a witness' relationship to the government. See United States v. Muscarella, 585 F.2d 242, 248 (7th Cir. 1978); cf. United States v. Boyd, 55 F.3d 239, 245-46 (7th Cir. 1995) (ruling that testimony in exchange for special favors to a witness by the government or favorable treatment in the criminal justice system should be disclosed as impeachment evidence). This information includes the informant's relationship with the government outside of the particular case at issue. See United States v. Williams, 954 F.2d 668, 671-72 (11th Cir. 1992). "The jury has the right to know what may be motivating a witness, especially a government paid, regularly employed, informant-witness." Id. at 672.

There may indeed be some unique circumstances where a district court within its discretion excludes some of this evidence as irrelevant. However, the district judge should, at the very least, provide the appellate court with a record--even if sealed--to review. By not establishing a record, the district court effectively nullifies appellate review. See United States v. Southard, 700 F.2d 1, 11 (1st Cir. 1983). Consequently, I believe that the court below abused its discretion.

My colleagues conclude that the defendants were not prejudiced because the error, if any, was harmless. Chavez admitted on cross-examination that he was a paid government informant. Therefore, the majority finds that any other evidence of payments would have been merely cumulative. Because the record is incomplete, however, I do not believe that we can make that determination. Furthermore, Chavez was an

important government witness who detailed drug deals and other illegal activities among the co-conspirators. His testimony may very well have been effectively impeached if the jury knew his complete relationship to the prosecution.

Therefore, I respectfully dissent on these two issues.

/1 Fed. R. Crim. P. 16(a)(1)(C) requires discovery of certain documents, including those that are "material to the preparation of the defendant's defense."

/2 In Phillips, the appellate court was able to review the entire file that the district court had viewed in camera. 854 F.2d at 277.